**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MOHAMMED ABUOJAYLAH ALI ANBEES;)
MOHAMMED ABUOJAYLAH ALI ANBEES )
FOR THE ESTATES OF ABUOJAYLAH ALI )
MOHAMMED ANBEES, MOHANAD       )
ABUOJAYLAH ALI ANBEES, AND     )
HAMZA AMAR JUMMA BARBASH       )    CIVIL ACTION NO. 1:23-cv-02061
Harir Street                   )
Espiaa, Libya                  )
                               )
                  Plaintiffs,  )
                               )    **FIRST AMENDED COMPLAINT FOR**
v.                             )    **EXTRAJUDICIAL KILLING AND**
                               )    **TORTURE**
KHALIFA HIFTER                 )
Ar Rajmah, Libya               )    JURY TRIAL DEMANDED
                               )
and                            )
                               )
PAVEL PRIGOZHIN                )
Individually and as administrator of the )
Estate of Mr. Yevgeny Prigozhin )
PMC Wagner Center              )
Saint Petersburg, Russia       )
                               )
                  Defendants.  )
                               )

**COMPLAINT**

1.      Plaintiff Mohammed Abuojaylah Ali Anbees ("Plaintiff Anbees") brings this

suit on his behalf and as Personal Representative of the Estates of Abuojaylah Ali Mohammed

Anbees, Mohanad Abuojaylah Ali Anbees, and Hamza Amar Jumma Barbash (collectively,

"Decedents"), by and through his undersigned counsel, to seek a judgment against Defendants

under the Torture Victims Protection Act of 1991, 28 U.S.C. § 1350, for severe personal

injuries and other irreparable harm suffered as a result of Defendants' unlawful acts of

extrajudicial killing and torture of Decedents and unlawful torture of Plaintiff Anbees.

1

## I. INTRODUCTION

2.      Defendant Khalifa Defendant Hifter ("Defendant Hifter") is an American citizen and has previously resided in Northern Virginia. In 2014, Defendant Hifter traveled from Virginia to Libya and declared himself the leader of the Libyan National Army ("LNA"). Defendant Hifter subsequently orchestrated an operation to overthrow Libya's internationally recognized Government of National Accord ("GNA"). Defendant Hifter currently resides in Ar Rajmah, Libya.

3.      Defendant Pavel Prigozhin ("Defendant Prigozhin") is believed to be the administrator of the estate of his late father, Mr. Yevgeny Prigozhin. Yevgeny Prigozhin was a Russian citizen and leader and co-founder of the Russian state-sponsored private military company ("PMC"), the Wagner Group ("Wagner"). Yevgeny Prigozhin was a close associate of Russian President Vladimir Putin and at times operated Wagner as a proxy for the Russian government. In 2014, Yevgeny Prigozhin began to deploy Wagner mercenary forces to support Defendant Hifter's military bid to invade Libya's capital city, Tripoli. Yevgeny Prigozhin died in an airplane crash in Russia on August 23, 2023, and was succeeded by his son, Defendant Prigozhin.

4.      Under Defendant Hifter's complete command authority, the LNA engaged in a campaign of war crimes, torture, and extrajudicial killing to overthrow the GNA.

5.      Yevgeny Prigozhin commanded Wagner forces in Libya to support the LNA and Defendant Hifter's campaign.

6.      By 2019, there were an estimated 1,000 Wagner fighters in Libya.

7.      Plaintiff and his family members were targeted as part of a campaign by

Defendant Hifter to invade Tripoli and overthrow the internationally recognized government of Libya.

8.      Defendant Hifter and Yevgeny Prigozhin coordinated the use of Wagner mercenary forces commanded by Yevgeny Prigozhin to execute Defendant Hifter's plan to take control of Libya. According to that plan, Defendant Hifter and Yevgeny Prigozhin, acting under actual or apparent authority or color of law of a foreign nation, intentionally and deliberately tortured Plaintiff and tortured and killed Plaintiff's family members.

9.      These killings were deliberate, not authorized by any court or judgment, and unlawful under the laws of the United States, Libya, and international law.

## II. PARTIES

### A.      <u>The Plaintiff</u>

10.      Plaintiff Anbees is a Libyan citizen and the son of decedent Abuojaylah Ali Mohammed Anbees ("Deceased Father"), brother of decedent Mohanad Abuojaylah Ali Anbees, and  ("Deceased Brother"), and brother-in-law of decedent Hamza Amar Jumma Barbash ("Deceased Brother-in-Law").

### B.      <u>The Defendants</u>

11.      Defendant Hifter is an individual person who is a dual citizen of Libya and the United States and resides in Libya.

12.      Defendant Hifter does not have head-of-state immunity or foreign official immunity, nor does he have any other statutory or common law immunity or privilege. Defendant Hifter has extensively litigated and lost on these issues. *See* Proposed Findings of Fact and Recommendations, *Elzagally v. Defendant Hifter*, 1:19-cv-853 (E.D.V.A. June 10, 2022) (Dkt. No 149). The U.S. Department of State has declined to file a statement of interest in recent

civil cases against Defendant Hifter during both the Trump and Biden Administrations.[1]

13.    Defendant Prigozhin is an individual person who is a citizen of Russia and succeeded Yevgeny Prigozhin as the head of Wagner and the administrator of Yevgeny Prigozhin's estate.[2]

### III. JURISDICTION

14.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because this action arises under the Torture Victim Protection Act of 1991, codified at 28 U.S.C. § 1350. This case arises under Acts of Congress and the Treaties of the United States.

15.    The exercise of personal jurisdiction is appropriate under Fed. R. Civ. Proc. 4(k)(2) because this claim arises under the Torture Victim Protection Act, the Defendants are beyond the jurisdiction of any state's courts of general jurisdiction, and exercising jurisdiction is consistent with the Constitution and United States law.

### IV. VENUE

16.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(3) because there is no district in which this action may otherwise be brought and because Defendants are subject to the Court's personal jurisdiction regarding this action. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(f)(4) because the Defendants act as agents or instrumentalities of foreign states.

### V. FACTUAL ALLEGATIONS

A.    **Governance in Libya**

---

[1] *See* Notice by the United States of America, Elzagally, (January 4, 2021) (Dkt. No 46) and Notice by the United States of America, Elzagally, (May 14, 2021) (Dkt. No 62).

[2] "Yevgeny Prigozhin's son to inherit $120M fortune, Wagner Group after Russian warlord's death," New York Post, October 2, 2023, at *https://nypost.com/2023/10/02/yevgeny-prigozhins-son-to-inherit-fortune-wagner-group/* (accessed July 29, 2024).

17.     From 1969 to 2011, Libya was under the de-facto control of the commander in chief of the armed forces and leader of Libya's governing body, Colonel Muammar Gaddafi ("Gaddafi").

18.     In early 2011, a wave of mass protests swept across the Middle East and North Africa known as the "Arab Spring." A protest movement emerged in Libya demanding democracy, respect for human rights, and an end to state and institutional corruption. Gaddafi's regime brutally repressed the popular protests and used lethal force against demonstrators, solidifying the political opposition before turning into rebellion.

19.     From February to October of 2011, an anti-Gaddafi revolution swept across Libya as civilians took up arms, militia brigades organized to overthrow Gaddafi, and revolutionary armed groups aided by the international community engaged in an armed struggle with forces loyal to Gaddafi.[3] Gaddafi's last strongholds fell in October 2011 and led to the revolution and the end of the civil war.  On October 20, 2011, Gaddafi was killed in Sirte, Libya, the last hold-out city for Gaddafi supporters.[4]

20.     On July 7, 2012, Libyans took part in an election to pick 200 representatives for the new legislative authority, the General National Congress ("GNC"), in the country's first successful democratic election in more than 40 years. The election was followed by the rapid transfer of power from the ad hoc National Transitional Council ("NTC") to the duly elected GNC.[5]

---

[3] "Gaddafi: Death of a Dictator," Human Rights Watch, October 16, 2012, at *https://www.hrw.org/report/2012/10/16/death-dictator/bloody-vengeance-sirte* (accessed September 14, 2022).

[4] Mary Beth Sheridan, "Moammar Gaddafi killed in rebel custody as last loyalist holdout in Libya falls," The Washington Post, October 20, 2011, at https://www.washingtonpost.com/world/middle_east/gaddafis-home-town-overrun-conflicting-reports-on-his-fate/2011/10/20/gIQAMwTB0L_story.html (accessed September 14, 2022).

[5] "Final Report: General National Congress Elections in Libya," The Carter Center, July 7, 2012, at *https://www.cartercenter.org/resources/pdfs/news/peace_publications/election_reports/libya-070712-final-rpt.pdf* (accessed September 14, 2022).

21.     On June 25, 2014, parliamentary elections were held that established the House of Representatives ("HoR") as Libya's legislative authority, replacing the GNC with a mandate to govern until a constitution could be written.[6] The outcome of the June 2014 election for a replacement of the GNC was contested by GNC holdouts, and clashes broke out between those loyal to the HoR, including Defendant Hifter's forces, and groups loyal to the outgoing GNC.[7]. The HoR relocated to Tobruk, Libya and formed a new rival government. The Libyan government was divided in two, with one governing in Tripoli and one in Tobruk.

22.     On November 6, 2014, the HoR was declared invalid by the Tripoli-based Supreme Court, leaving Libya with no parliament or government able to claim national legitimacy.[8]

23.     On December 17, 2015, following 18 months of negotiations led by the United Nations ("UN") representatives from the two competing governing institutions, the HoR and the GNC, signed the Libyan Political Agreement ("LPA") to reconcile the HoR and GNA within a single administration and end the political gridlock and armed fighting that had started in 2014.[9] The LPA established a nine-member Presidency Council ("PC") that was tasked with forming a unity government, the Government of National Accord ("GNA"), and was to function as the head of state and supreme commander of the armed forces. The LPA made the HoR the primary

---

[6] Nicola Missaglia, "Chaos in Libya: A Background," Istituto per gli Studi di Politica Internazionale (ISPI), February 2, 2017, at *https://www.ispionline.it/it/pubblicazione/chaos-libya-background-17108* (accessed September 14, 2022).

[7] Christopher M. Blanchard, "Libya: Transition and U.S. Policy," Congressional Research Service, April 20, 2016, at *https://apps.dtic.mil/sti/pdfs/AD1013588.pdf* (accessed September 14, 2022).

[8] Joanna Apap, "Political developments in Libya and prospects of stability," European Parliamentary Research Service, 2017, at
*https://www.europarl.europa.eu/RegData/etudes/BRIE/2017/603959/EPRS_BRI(2017)603959_EN.pdf* (accessed September 14, 2022).

[9] "Libyan Political Agreement - As signed on 17 December 2015," United Nations Support Mission in Libya (UNSMIL), 2015, at *https://unsmil.unmissions.org/sites/default/files/Libyan%20Political%20Agreement%20-%20ENG%20.pdf* (accessed September 14, 2022).

legislature and GNC members were to form a secondary consultative body called the State Council.[10] The interim GNA was formed with the intent of holding new elections within two years. The GNA was internationally recognized as Libya's sole legitimate government, including by the United States and the UN.

24.     In 2016, the HoR withheld its endorsement of the GNA. In August 2016, the HoR voted overwhelmingly to reject a GNA cabinet proposed by the PC.[11]

25.     At the end of 2016, Libya had three competing governments: the Tripoli-based and United States and UN-supported PC; the Tripoli-based successor of the GNC, the National Salvation Government ("NSG"); and the interim government associated with the HoR in eastern Libya.[12]

26.     In 2017, as various armed groups continued to engage in active fighting, none of the country's feuding political institutions constituted an effective national government, and all were dependent for their security on fragile alliances with autonomous armed groups.[13] The UN-backed the Tripoli-based GNA, not the rival Interim Government based in the east.[14]

27.     On May 29, 2018, French President Emmanuel Macron held a conference in Paris with rival Libyan figures who reached an agreement to hold parliamentary and presidential

---

[10] "Libya: Freedom in the World 2017 Country Report," Freedom House, 2017, at *https://freedomhouse.org/country/libya/freedom-world/2017* (accessed September 14, 2022).

[11] Ayman al-Warfalli, "Libya's eastern parliament votes against U.N.-backed government in Tripoli," Reuters, August 22, 2016, at *https://www.reuters.com/article/us-libya-security-un-idUSKCN10X1DY* (accessed September 14, 2022).

[12] Mary Fitzgerald and Mattia Toaldo, "A quick guide to Libya's main players," European Council on Foreign Relations, May 19, 2016, at *https://ecfr.eu/special/mapping_libya_conflict/#cap1* (accessed September 14, 2022).

[13] "Libya: Freedom in the World 2018 Country Report," Freedom House, 2018, at *https://freedomhouse.org/country/libya/freedom-world/2018* (accessed September 14, 2022).

[14] "World Report 2018: Libya," Human Rights Watch, 2018, at *https://www.hrw.org/world-report/2018/country-chapters/libya* (accessed September 14, 2022).

elections by December 10, 2018.[15] Ultimately the efforts to organize elections in 2018 faltered, which led to the UN's proposal to hold elections at the end of 2019.[16]

28.    In early 2019, the United Nations Support Mission in Libya ("UNSMIL") was working toward a national conference meant to end Libya's political divisions. Two weeks before the conference was to begin, Defendant Hifter launched an offensive aimed at the capital, Tripoli, where the GNA was based.[17]

29.    In October 2020, the UN brokered a cease-fire between the Libyan Army of the GNA and the LNA.[18]

30.    In November 2020, UNSMIL facilitated the first round of the Libyan Political Dialogue Forum ("LPDF"), a 74-member delegation composed of representatives from across Libya, that voted on electoral lists consisting of a prime minister and a separate 3-member Presidential Council.

31.    In February 2021, the LPDF selected an interim Government of National Unity ("GNU") tasked with overseeing the presidential and parliamentary elections that had been set for December 2021. The LPDF also selected interim Executive Authority members, Mohamed Al-Menfi as President-designate of the PC and Abdul Hamid Dbeibah as prime minister, until national elections could be held.[19]

---

[15] "Libyan factions commit to Dec. 10 elections at Paris talks," France24, May 29, 2018, at *https://www.france24.com/en/20180529-libya-factions-commit-december-10-elections-paris-talks-seraj-haftar* (accessed September 14, 2022).

[16] "Libya: Freedom in the World 2019 Country Report," Freedom House, 2019, at *https://freedomhouse.org/country/libya/freedom-world/2019* (accessed September 14, 2022).

[17] "Libya: Freedom in the World 2020 Country Report," Freedom House, 2020, at *https://freedomhouse.org/country/libya/freedom-world/2020* (accessed September 14, 2022).

[18] "Agreement for a Complete and Permanent Ceasefire in Libya," UNSMIL, October 23, 2020, at *https://unsmil.unmissions.org/sites/default/files/ceasefire_agreement_between_libyan_parties_english.pdf* (accessed September 14, 2022).

[19] "S/2021/451 - Report of the Secretary-General," United Nations Security Council, May 11, 2021, at *https://www.securitycouncilreport.org/atf/cf/%7B65BFCF9B-6D27-4E9C-8CD3-CF6E4FF96FF9%7D/s_2021_451_e.pdf* (accessed September 14, 2022).

32.     In March 2021, the HoR voted in favor of installing the new interim GNU to replace the GNA. A peaceful transition of power took place from the GNU to GNA shortly after the HoR voted for approval.

33.     In December 2021, it was announced that the December 24, 2021, elections would be postponed.[20]  After the delay of the planned elections, the HoR declared that the mandates of the GNU and interim Prime Minister Dbeibah had expired.[21]

34.     In February 2022, the HoR appointed former Interior Minister Fathi Bashagha as the new prime minister.[22] Soon thereafter, the UN announced its continued support of Dbeibah.[23]

35.     On March 1, 2022, the HoR held a vote of confidence in the appointment of a new government led by Bashagha, known as the Government of National Stability.[24]

**B.      Defendant Hifter's Military Occupation of Libya**

36.     Defendant Hifter was a member of Libya's military under Gaddafi before defecting to the United States in the late 1980s. In February 2014, Defendant Hifter began a seizure of power in eastern Libya with an appearance on television calling for the unilateral dissolution of the temporary GNC.

37.     Following this address, Defendant Hifter ordered forces loyal to him in eastern

---

[20] "Libyan elections postponed, new date expected within 30 days," United Nations, December 23, 2021, at *https://news.un.org/en/story/2021/12/1108732* (accessed September 14, 2022).

[21] Human Rights Council, "A/HRC/49/4 - Report of the Independent Fact-Finding Mission on Libya," United Nations Office of the High Commissioner for Human Rights (OHCHR), March 23, 2022, at *https://www.ohchr.org/sites/default/files/2022-03/A_HRC_49_4_AUV.pdf* (accessed September 14, 2022).

[22] Vivian Yee and Mohammed Abdusamee, "Libya Slides Deeper Into Chaos as Parliament Picks New Government," The New York Times, February 10, 2022, at *https://www.nytimes.com/2022/02/10/world/middleeast/libya-tripoli-parliament-election.html* (accessed September 14, 2022).

[23] "UN backs Libya's interim PM despite lawmakers' challenge," Deutsche Welle (DW), February 10, 2022, at *https://www.dw.com/en/un-backs-libyas-interim-pm-despite-lawmakers-challenge/a-60729255* (accessed September 14, 2022).

[24] Human Rights Council, "A/HRC/49/4 - Report of the Independent Fact-Finding Mission on Libya," OHCHR, March 23, 2022, at *https://www.ohchr.org/sites/default/files/2022-03/A_HRC_49_4_AUV.pdf* (accessed September 14, 2022).

Libya to initiate "Operation Dignity", an armed offensive intended to take control of Benghazi. During this attempted coup, forces commanded by Defendant Hifter embarked on an internationally documented campaign of detention, torture, and extrajudicial killing, intending to clear eastern Libya of rival political and military groups.

38.     On March 2, 2015, following Defendant Hifter's offensive, the HoR appointed Defendant Hifter as commander-in-chief of Libya's military forces, the LNA.

39.     Soon after taking command of the LNA in September 2015, Defendant Hifter posted a video message ordering his forces to show "no mercy" and to take no prisoners.

40.     In 2016, the eastern-based HoR, having effectively split from the internationally recognized GNC, elevated Defendant Hifter's status from lieutenant general to Field Marshal.

41.     Defendant Hifter continued his military offensives under the color of authority of the HoR, which had now effectively severed the LNA from Libya's internationally recognized government. Throughout this time, Defendant Hifter's army continued a campaign of war crimes.

42.     In one particularly heinous case, forces associated with Defendant Hifter directed, recorded and published a series of gruesome executions and corpse desecration.[25] Thirty-three prisoners were tortured and killed. The International Criminal Court issued arrest warrants against Defendant Hifter's lieutenant in 2017.[26] Instead of disciplining or turning over the

---

[25] "Situation in Libya: In the Case of the Prosecutor v. Mahmoud Mustafa Busayf al-Werfalli," International Criminal Court, July 4, 2018, at *https://www.icc-cpi.int/sites/default/files/CourtRecords/CR2018_03552.PDF* (accessed September 14, 2022).

[26] "Case Information Sheet: The Prosecutor v. Mahmoud Mustafa Busyf Al-Werfalli," International Criminal Court, updated June 2022, at *https://www.icc-cpi.int/sites/default/files/2022-09/al-werfalliEng.pdf* (accessed September 14, 2022).

lieutenant, Defendant Hifter promoted him to the rank of lieutenant colonel in July 2019.[27]

43.    On April 4, 2019, Defendant Hifter officially ordered his forces to advance on Tripoli in a "victorious march" to "shake the lands under the feet of the unjust bunch" in an audio recording released on the Facebook page of the LNA's media office.[28] Defendant Hifter warned, "We are coming Tripoli, we are coming."  On that day, the LNA launched a deadly offensive on the capital of Tripoli controlled by the GNA. The assault lasted until June 4, 2020. During the offensive ordered by Defendant Hifter, the LNA launched attacks on non-military targets with disregard for human life, targeting civilians, residential neighborhoods, medical facilities, and healthcare personnel, alleging that they were "terrorist targets".

44.    Defendant Hifter continues to oppose the internationally recognized GNA. Defendant Hifter has received support from foreign governments, including Russia and Egypt. The Russian government has provided Defendant Hifter with extensive military support and billions of dollars in financial support.[29]

## C.    Wagner in Libya

45.    Wagner has been present in Libya to support Defendant Hifter's forces since October 2018.[30]

---

[27] Mohamed Sabry Emam Muhammed, "Libya's Defendant Hifter promotes officer wanted for war crimes," Anadolu Agency, July 8, 2019, at *https://www.aa.com.tr/en/africa/libyas-haftar-promotes-officer-wanted-for-war-crimes/1526036* (accessed September 14, 2022.

[28] " القائد العام المشير خليفة حفتر يوجه خطابا لكل وحدات الجيش الليبي المرابطين في المنطقة الغربية," مكتب الاعلام ـ القيادة العامة للقوات المسلحة الليبية, April 4, 2019, at *https://youtu.be/GhCVi38o7bA* (accessed September 14, 2022). القائد العام المشير خليفة حفتر يوجه خطابا لكل وحدات الجيش الليبي المرابطين في المنطقة الغربية

[29] "*East Africa Counterterrorism Operation, North and West Africa Counterterrorism Operation, July 1, 2020 - September 30, 2020,*" U.S. Department of Defense, 2020, at https://media.defense.gov/2020/Nov/25/2002541626/-1/-1/1/LEAD%20IG%20EAST%20AFRICA%20AND%20NORTH%20AND%20WEST%20AFRICA%20COUNTERTERRORISM%20OPERATIONS.PDF

[30] "*Final report of the Panel of Experts on Libya established pursuant to Security Council resolution 1973 (2011)*" United Nations, March 8, 2021, https://www.hrw.org/news/2022/05/31/libya-russias-wagner-group-set-landmines-near-tripoli#:~:text=a%20March%202021-,report,-that%20private%20military

46.     U.S. Africa Command ("AFRICOM"), estimated that 2,000 Wagner mercenaries were in Libya between July to September 2020.[31]

47.     General Stephen Townsend, a representative of AFRICOM, gave a statement before Congress where he testified that PMCs, specifically Wagner, are frequently used to "prop up corrupt regimes" and are "leading the fight" for the LNA.[32]

48.     Members of Wagner have been stationed in populated areas in the suburbs of Tripoli to support Defendant Hifter's attack on the capital. Their presence has been evidenced by the deaths of as many as 35 Wagner members in areas surrounding Tripoli by October 2019.[33]

49.     By July 2020, the United States Department of Defense reported that Wagner forces were operating in Libya and being supplied with fighter aircraft, military armored vehicles, air defense systems, and other supplies.[34]

**D.     Events of September 23-24, 2019**

50.     Plaintiff Anbees lived on Harir Street in Espiaa, a rural village about 30 miles south of Tripoli. On September 23, 2019, Plaintiff Anbees, Deceased Father, Deceased Brother, Deceased Brother-in-Law, and brother of Plaintiff Anbees, Husam, (collectively, "Plaintiff Anbees and his family members") were all at a family home where they had fled to avoid the ongoing assault on Tripoli. At about 2:30 pm local time in Libya, there seemed to be a lull in fighting and Plaintiff Anbees left the family home to retrieve a television remote from his farm a

---

[31] United States Africa Command Public Affairs, "*Russia, Wagner Group complicating Libyan ceasefire efforts*", United States Africa Command, July 15, 2020, https://www.africom.mil/pressrelease/33008/russia-wagner-group-complicating-libyan-cease

[32] Statement Of General Stephen J. Townsend, United States Army Commander United States Africa Command Before The Senate Armed Services Committee, "*A secure and stable Africa is an enduring American interest*", January 30, 2020, https://www.armed-services.senate.gov/imo/media/doc/Townsend_01-30-20.pdf

[33] Liliya Yapparova, *"A small price to pay for Tripoli Between 10 and 35 Russian mercenaries have been killed in the Libyan Civil War. We identified several of them."*, Meduza, October 2, 2019.

[34] "*Russia, Wagner Group Continue Military Involvement in Libya*", United States Department of Defense, July 24, 2020, https://www.defense.gov/News/News-Stories/article/article/2287821/russia-wagner-group-continue-military-involvement-in-libya/

couple of miles away. Plaintiff Anbees drove on a route he frequently used to get to the farm consisting of dirt back roads and fields to circumvent potentially dangerous main roads.

51.    After driving about 800 yards, Plaintiff Anbees encountered armed soldiers in uniforms in the road and the soldiers signaled towards Plaintiff Anbees's vehicle. Plaintiff Anbees assumed these soldiers were Libyan and that they were instructing him to turn around. Plaintiff Anbees made a U-turn to drive back toward his home. As Plaintiff Anbees was turning, the soldiers started firing shots into the air.

52.    Plaintiff Anbees drove away and returned to the family home. After about 30 minutes, around 3:00 pm, three to six men armed with AK-47 rifles approached the home of Plaintiff Anbees and silently entered through the unlocked front door. The men aimed their weapons at Plaintiff Anbees and his family members, catching them off guard. Plaintiff Anbees concluded that the armed men were mercenaries from Wagner ("Wagner soldiers") because the men had blue eyes, were handling their weapons like professionals, drove a unique model of vehicle, and because there was a widespread presence of the Wagner in the area at that time.

53.    The Wagner soldiers confiscated the phones from Plaintiff Anbees and his family members. The Wagner soldiers escorted Plaintiff Anbees and his family members to a Nissan pickup truck where three more Wagner soldiers were waiting. The Wagner soldiers ordered Plaintiff Anbees and his family members to get into the truck bed. The Wagner soldiers blindfolded and pointed guns at Plaintiff Anbees and his family members and proceeded to drive to a location about 20 minutes away.

54.    The Wagner soldiers stopped the vehicle and removed the blindfolds. Plaintiff Anbees recognized the location to be a residential home in Qasr bin Ghashir, a village that was a Wagner Group military base at the time. Through the open door of the house, Plaintiff Anbees

saw about 35 Russian men, presumably all Wagner soldiers, inside sleeping and drinking alcohol. Plaintiff Anbees and his family members asked the Wagner soldiers in Arabic why they had been captured and why they were at this location but received no response.

55.     Shortly thereafter, the Wagner soldiers forced Plaintiff Anbees and his family members into another Nissan pickup truck with heavily tinted windows. The Wagner soldiers driving the vehicle passed easily through roadblocks by honking their horns. All roadblocks in this area at this time were controlled by forces associated with the LNA and Defendant Hifter. The vehicle arrived at a juice factory. The Wagner soldiers stopped the vehicle and bound the arms and legs of Plaintiff Anbees and his family members before wrapping a plastic bag around each man's face.

56.     The Wagner soldiers forced Plaintiff Anbees and his family members into the back of a refrigerated box truck with minimal air circulation. The Wagner soldiers drove the truck for approximately four to five hours, intermittently opening the back container to pour water on Plaintiff Anbees and his family members.

57.     At approximately 9:00 pm, the Wagner soldiers removed Plaintiff Anbees and his family members from the truck. Plaintiff Anbees requested to use a bathroom. One of the Wagner soldiers escorted Plaintiff Anbees to a bathroom and while walking, put a pistol to the head of Plaintiff Anbees and asked in broken English if Plaintiff Anbees was Muslim and a member of ISIS.

58.     At about 11:00 pm, the Wagner soldiers transported Plaintiff Anbees and his family members in the box truck back to the residential location that Plaintiff Anbees had recognized. Plaintiff Anbees and his family members were put in a room in the house with Russian men inside. Wagner soldiers stood outside of the room and ordered Plaintiff Anbees and

14

his family members to sleep.

59.     The next morning, September 24, 2019, Plaintiff Anbees and his family members were awoken and blindfolded by Wagner soldiers and transported to an area near the home of Plaintiff Anbees. Wagner soldiers dragged each man out of the vehicle, dragging Plaintiff Anbees out last. The Wagner soldiers ordered Plaintiff Anbees and his family members to kneel on the ground. Plaintiff Anbees heard the clicking sound of someone loading a gun and trying to pull the trigger and the Wagner soldier putting Plaintiff Anbees on his knees dropped his hands off Plaintiff Anbees and ran away, pulling the trigger on his weapon as well.

60.     Two Wagner soldiers began firing their AK-47 rifles in rapid succession at Plaintiff Anbees and his family. Plaintiff Anbees believed that the soldiers were intoxicated because the shots, while aimed at the kneeling men, were being fired haphazardly. At the start of the shooting, Plaintiff Anbees fell over and pretended to be dead and avoided being shot. The shooting eventually concluded, and Plaintiff Anbees had to lay on the ground in pools of the blood of his family members until he heard the Wagner soldiers get back in the vehicle and drive away.

61.     Deceased Father, Deceased Brother, and Deceased Brother-In-Law were killed. Plaintiff Anbees saw their bodies covered in wounds and blood. The surviving brother of Plaintiff Anbees, Husam, was shot in the leg but survived the gunfire. Plaintiff Anbees put his surviving brother over his shoulder and escaped to the house of a relative before going to a hospital.

62.     Official documentation issued by the Libyan government identifies the cause of death of Deceased Brother as several bullet holes sustained from multiple gunshots.

63.     The official forensic report issued by Libyan's Ministry of Justice reports the

Father's cause of death as, "several gunshot wounds that hit the head, neck, trunk, upper and lower extremities, and led to fractures of the skull bones and laceration of brain tissue accompanied by severe bleeding, all of which led to a sharp decline in the circulatory and respiratory system, which led to death."

64.     The official forensic report issued by Libyan's Ministry of Justice reports the Deceased Brother-in-Law's cause of death as, "several gunshot wounds to the torso, upper limbs, and lower limbs, which led to lacerations in the lungs, bleeding within the thoracic cavity, lacerations in the liver, stomach, and intestines, and bleeding inside the abdominal cavity. These injuries led to a sharp decline in the circulatory and respiratory system, which led to death."

65.     The medical report for Husam provides that he suffered a gunshot wound to his right leg, where the bullet entered and exited, fracturing both bones of the leg. The wound caused soft tissue injury as well as injury to the nerves and blood vessels. The hospital could not repair Husam's wound, and his leg was amputated on September 24, 2019.

66.     Further, the Libyan Ministry of Health issued death certificates for the Deceased Father, Deceased Brother, and Deceased Brother-in-Law noting the cause of death for all three as "gunshots".

67.     Plaintiff Anbees suffered great emotional and psychological harm as a result of the events occurring on September 23 and 24 of 2019.

**E.     Defendant Hifter's Command Responsibility**

68.     Defendant Hifter has asserted himself as the unequivocal leader of the LNA, emphasizing that he gives all final commands. Defendant Hifter has not identified anyone to be his successor and no military leader with the same level of authority and respect as Defendant Hifter has emerged to serve as an obvious replacement or to question any of the decisions of

Defendant Hifter.

69.    Defendant Hifter is the Field Marshall and the General Commander of the LNA and gives all executive orders to the military.

70.    As the commander of the LNA, Defendant Hifter has a duty under both domestic law and international law to ensure the protection of civilians, to prevent the LNA from violating international law, and to ensure all persons under his command are trained in, comply with, and punished, when necessary, under the laws of warfare. These laws include the prohibition of torture and extrajudicial killing.

71.    In a YouTube video posted on October 10, 2015, Defendant Hifter is recorded giving a speech to his LNA fighters on September 18, 2015, calling on his men to take no prisoners. "Nevermind consideration of bringing a prisoner here. There is no prison here. The field is the field, end of the story."[35]

72.    Other LNA officials have made similar statements regarding prisoners. In another video from August 2016, Beleed Al Sheikhy, identified as a spokesperson for Defendant Hifter, said concerning fighting in Ganfouda, "Whoever is above 14 years of age will never get out alive."[36]

73.    In August 2017, members of the LNA admitted that their commander, Defendant Hifter, had ordered them to kill captives in public and to show no mercy to cause horror.[37] "We were killing them captives in public and we published their killing videos to the public," a

---

[35] Stephanie Kirchgaessner and Ruth Michaelson,"General accused of war crimes courted by west in Libya", *The Guardian*, Sept. 25, 2017, https://www.theguardian.com/world/2017/sep/25/khalifa-haftar-libyan-general-accused-of-human-rights-abuses

[36] *Id.*

[37] Abdullah Ben Ibrahim, "*Dignity Operation militias defy ICC arrest warrant by boasting of war crimes*", Aug. 19, 2017, https://libyaobserver.ly/news/dignity-operation-militias-defy-icc-arrest-warrant-boasting-war-crimes

militiaman boasted in a statement.[38]

74.    Defendant Hifter has failed or refused to take all necessary measures to investigate and prevent such abuses, and he has failed to punish personnel under his command for committing such abuses. The acts of torture and extrajudicial killing inflicted upon Plaintiff Anbees and the decedents were part of a pattern and practice of systematic or widespread human rights violations against the civilian population. At all relevant times, Defendant Hifter intentionally directed, knew, or reasonably should have known that his targets were not legitimate military targets and that his forces engaged in a pattern and practice of gross human rights abuses.

F.    **Yevgeny Prigozhin's Command Responsibility**

75.    In September 2022, Yevgeny Prigozhin posted a statement admitting that he founded the Wagner Group in 2014, saying, "I cleaned the old weapons myself, sorted out the bulletproof vests myself".[39]

76.    Yevgeny Prigozhin had been the commander of Wagner since its inception until his death on August 23, 2023. In July of 2023, Vladimir Putin told a Russian newspaper that Yevgeny Prigozhin refused to let his fighters serve under someone else's command.[40]

77.    The United States, European Union, United Nations, and others say Wagner has involved itself in conflicts in Libya under Yevgeny Prigozhin's command. The European Union has recognized Yevgeny Prigozhin's relationship with Defendant Hifter and the LNA with

---

[38] *Id.*

[39] Cora Engelbrecht, "Putin Ally Acknowledges Founding Wagner Mercenary Group", *The New York Times*, September 26, 2022, https://www.nytimes.com/2022/09/26/world/europe/russia-wagner-group-Defendant Prigozhin.html

[40] Agence France Presse, "Russia Could Give Legal Status To Private Military Groups: Kremlin", *Barron's*, July 14, 2023, https://www.barrons.com/news/putin-says-Defendant Prigozhin-refused-to-cede-command-of-wagner-64f687ef?refsec=topics_afp-news

sanctions. The Council of the European Union imposed sanctions on Yevgeny Prigozhin and Wagner for their role in the conflict in Libya, accusing Yevgeny Prigozhin of providing "material support" to the LNA and of "undermining the stability of Libya." These sanctions were affirmed by the European General Court in 2022.[41]

78.     Yevgeny Prigozhin commanded the Wagner forces in Libya that supported the LNA and Defendant Hifter's campaign. By commanding the actions of Wagner at the direction of Defendant Hifter, Yevgeny Prigozhin was acting in an official capacity on behalf of the LNA. Therefore, Yevgeny Prigozhin is personally liable for extrajudicial killings and torture committed by Wagner soldiers because he gave orders to the soldiers as the chief of Wagner while operating under the authority of Defendant Hifter and the LNA. After, Yevgeny Prigozhin's death, Defendant Prigozhin succeeded Yevgeny Prigozhin as the administrator of Yevgeny Prigozhin's estate.

**G.     Relationship Between the Defendants**

79.     The documented relationship between Defendant Hifter and Yevgeny Prigozhin dates back as early as 2018. In 2018, Defendant Hifter traveled to Russia to meet with Russian defense officials. In video footage, Yevgeny Prigozhin was pictured amongst those attending the meeting with Defendant Hifter.[42]

80.     Defendant Hifter and Yevgeny Prigozhin have likely met or coordinated several times. U.N. sanctions monitors have identified more than two dozen flights between Russia and

---

[41] Molly Quell, "EU court upholds sanctions against 'Putin's chef'", *Courthouse News Service*, June 1, 2022, https://www.courthousenews.com/eu-court-upholds-sanctions-against-putins-chef/#:~:text=The%20European%20General%20Court%20found,consistent%20evidence%E2%80%9D%20of%20his%20involvement.

[42] Lead Command Media Bureau, Libyan Armed Forces, "Scenes from the Moment When Commander-in-Chief, Field Marshal Khalifa Defendant Hifter, Arrived at the Headquarters of the Russian Ministry of Defense", 2019, https://www.youtube.com/watch?v=Vp4e8u71o20

eastern Libya from August 2018 to August 2019 by civilian aircraft "strongly linked to, or owned by" Wagner Group or related companies.[43]

81.     Defendant Hifter hired fighters from Yevgeny Prigozhin's Wagner to serve as the decisive defense force of the LNA. Wagner fighters have reported that they are recruited by the promise of payment of approximately 240 thousand Rubles ($3,200) per month.[44]

82.     Yevgeny Prigozhin's connection to Defendant Hifter has been demonstrated through financing from nations that support Hifter and the LNA. The United Arab Emirates and Egypt are committed supporters of Hifter and have longstanding ties to Defendant Prigozhin and Wagner, cooperating with and supporting Wagner to back the LNA. The United States Department of Defense reported that the United Arab Emirates has provided significant financial support to Yevgeny Prigozhin and Wagner to support Defendant Hifter.[45]

83.     Defendant Hifter and Yevgeny Prigozhin have solidified their relationship through contract. UN Sanctions Monitors have investigated social media reports that a six-month contract between Wagner and Defendant Hifter ended on October 15, 2019.[46] In May 2020, it was reported that Defendant Hifter had only paid half of the more than $173 million owed to Yevgeny Prigozhin.[47] Defendant Hifter has reportedly disputed the contract, claiming that

---

[43] Michelle Nichols, "Up to 1,200 deployed in Libya by Russian military group: U.N. report," *Reuters*, May 6, 2020, https://www.reuters.com/article/us-libya-security-sanctions/up-to-1200-deployed-in-libya-by-russian-military-group-u-n-report-idUSKBN22I2XW

[44] "As Meduza found out, recruiters are gathering groups of mercenaries in Russia for a 'business trip to Donbass'. What they will do there is unknown", *Meduza*, December 22, 2021, https://meduza.io/feature/2021/12/22/kak-vyyasnila-meduza-verbovschiki-sobirayut-v-rossii-gruppy-naemnikov-dlya-komandirovki-v-donbass-chto-oni-tam-budut-delat-neizvestno

[45] DIA, response to DoD OIG request for information, 20.4 NWA 8E, 9/29/2020.

[46] Michelle Nichols, "Up to 1,200 deployed in Libya by Russian military group: U.N. report," *Reuters*, May 6, 2020, https://www.reuters.com/article/us-libya-security-sanctions/up-to-1200-deployed-in-libya-by-russian-military-group-u-n-report-idUSKBN22I2XW

[47] *Id.*

Wagner forces were inefficient and ineffective.[48]

84.    Defendant Hifter hired Yevgeny Prigozhin to provide the support of Wagner in the LNA offensive on Tripoli. Yevgeny Prigozhin was therefore operating Wagner under the authority of financier Defendant Hifter and the LNA.

**H.    Absence of Legal Remedies in Libya**

85.    Plaintiff Anbees cannot seek a legal remedy or appropriate civil relief in Libya.

86.    Plaintiff Anbees has filed complaints against Defendant Hifter in Libyan courts. The complaints resulted in arrest warrants being issued for Defendant Hifter. Defendant Hifter disregarded the warrants and identified Plaintiff as wanted and as a target. Plaintiff Anbees lives in fear and exile.

87.    As reported by the U.S. State Department, "[t]he judicial system did not have the capacity to provide citizens with access to civil remedies for human rights abuses" and [l]ack of security and intimidation by armed groups challenged the ability of authorities to enforce judgments."[49]

88.    Libyan domestic courts, affected by armed conflict and political changes, are barely functional, with procedures hampered by grave due process violations, including forced confessions, ill-treatment, and lack of access to lawyers.  In some areas, including South Libya, the criminal justice system has collapsed. Lawyers, judges, and prosecutors are also prime targets of militias.

89.    Attempts made by Plaintiff Anbees to seek a remedy against Defendant Hifter

---

[48] Abdulkader Assad, "Report: Defendant Hifter owes Russian Wagner Group $150 million as rift grows over rookie fighters", *Libya Observer*, May 14, 2020, https://libyaobserver.ly/news/report-haftar-owes-russian-wagner-group-150-million-rift-grows-over-rookie-fighters

[49] "Libya 2021 Human Rights Report," U.S. Department of State, Bureau of Democracy, Human Rights and Labor, 2021, pp. 13-14, at *https://www.state.gov/wp-content/uploads/2022/03/313615_LIBYA-2021-HUMAN-RIGHTS-REPORT.pdf* (accessed September 14, 2022).

have resulted in unenforceable rulings and a retaliatory response by Defendant Hifter that endangers Plaintiff Anbees.

## VI. TORTURE VICTIMS PROTECTION ACT

90.     The Torture Victim Protection Act ("TVPA") provides a civil cause of action for the victims of torture and extrajudicial killing against any individual who commits those acts under "the actual or apparent authority, or color of law, of any foreign nation."[50]

91.     The TVPA defines extrajudicial killing as a killing that is unlawful under international law and not authorized by the judgment of a regularly constituted court.

92.     The TVPA defines torture as acts directed against individuals in the offender's control that inflict severe physical or mental pain and suffering for punishment or intimidation of the victim or third parties.

## VII. FIRST CAUSE OF ACTION

**Extrajudicial Killing of Decedents in Violation of the Torture Victim Protection Act by Defendants Hifter and Prigozhin**

93.     Plaintiff Anbees realleges and incorporates by reference every allegation contained in the preceding paragraphs as if set forth fully herein.

94.     The killings of Decedents by forces commanded by Defendant Hifter and Yevgeny Prigozhin constitute extrajudicial killing in violation of the TVPA.

95.     The killing of Decedents was not authorized by any court judgment.

96.     The killing of Decedents violated international law, including the Third Geneva Convention.

97.     Defendant Prigozhin succeeded Yevgeny Prigozhin as the administrator of his

---

[50] Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note.

estate.

## VIII. SECOND CAUSE OF ACTION

**Torture of Plaintiff Anbees and Decedents in Violation of the Torture Protection Act by Defendants Hifter and Prigozhin**

98.    The severe pain and suffering inflicted upon Decedents before their deaths was torture as defined by the TVPA.

99.    At all relevant times, Defendant Hifter acted under actual or apparent authority or color of law. He was appointed commander of the LNA by the HoR before it broke away from Libya's internationally recognized government, and he has received the assistance of foreign nations, including Russia. Further, Defendant Hifter has attempted to conduct diplomacy as the leader of the LNA, including meeting with world leaders.

100.    Plaintiff Anbees is unable to obtain an adequate remedy in Libya given the ongoing hostilities and dysfunctional judicial system. Any attempt to obtain a remedy there would be futile and create a dire risk of reprisal due to Defendant Hifter's ongoing activities in Libya.

101.    Yevgeny Prigozhin is personally liable for, exercised command responsibility over, conspired with, or aided and abetted, the torture and killing of the Decedents and the torture of Plaintiff Anbees. Defendant Prigozhin succeeded Yevgeny Prigozhin as the administrator of his estate.

102.    Defendant Hifter is personally liable for, or exercised command responsibility over, or conspired with, or aided and abetted, the torture and killing of the Decedents and Plaintiff Anbees.

103.    As a result of the extrajudicial killings and torture of Decedents and the torture of

Plaintiff Anbees, Plaintiff Anbees is entitled to compensatory damages in an amount to be determined at trial.

104.    The actions of Defendant Hifter and Yevgeny Prigozhin were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages.

## IX. JURY TRIAL DEMANDED

105.    Plaintiff Anbees demands a jury trial on all issues.

WHEREFORE, Plaintiff prays that this court:

1. Enter Judgment against the Defendants on all counts;

2. Award compensatory damages in an amount to be proven at trial, but for each Plaintiff not less than $10,000,000.00;

3. Award punitive damages in an amount to be proven at trial, but for each Plaintiff not less than $10,000,000.00;

4. Award reasonable attorneys' fees and costs of suit; and

5. Award such further relief as this Court deems appropriate, just, and equitable.

Date: August 1, 2024

/s/Anas Bhairi
Anas A. Bhairi
D.C. Bar No. 1614819
Libyan American Alliance
1800 K St NW
Washington, DC 20006
(202) 793-7977
anas.bhairi@spectra.law

Attorney for Plaintiffs

24