UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMMED ABUOJAYLAH ALI ANBEES, *et al.*,

Plaintiffs,

v.

KHALIFA HIFTER, *et al.*,

Defendants.

Case No. 1:23-cv-02061-AHA
Judge Amir H. Ali

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SADDAM HIFTER'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Timothy Parlatore
Parlatore Law Group, LLP
260 Madison Ave., 17th Floor
New York, New York 10016
timothy.parlatore@parlatorelawgroup.com

Jason A. Masimore *(Pro Hac Vice to be filed)*
Brodbecks Law, PLLC
305 Broadway, 7th Floor
New York, New York 10007
jason.masimore@brodbeckslaw.com

*Counsel for Defendant Saddam Hifter*
*(Special Appearance — Without Submission to Jurisdiction)*

## Table of Contents

**PRELIMINARY STATEMENT** ..... 1

**FACTUAL BACKGROUND** ..... 2

- **A. The Proceedings So Far Relating to Defendant Saddam Hifter** ..... 2
- **B. The Alleged Incident** ..... 3
- **C. The Allegations Against Defendants Prigozhin and Khalifa Hifter** ..... 5
- **D. The Allegations Against Defendant Saddam Hifter** ..... 6

**ARGUMENT** ..... 7

- **A. This Court Lacks Personal Jurisdiction Over Defendant Saddam Hifter Because He Is Not Domiciled in Any United States Forum and the Complaint Alleges No Conduct Directed at the United States** ..... 7
- **B. Even If the Court Had Personal Jurisdiction Over Defendant Saddam Hifter, It Must Dismiss the Complaint Under Rule 12(b)(6) Because It Fails to State a Claim** ..... 11
  - **1. The Complaint Fails to Plead That Saddam Hifter Had Effective Control Over the Alleged Perpetrators, and the Command-Responsibility Claim Therefore Fails.** 12
  - **2. The Complaint Fails to Allege a "Deliberated" Killing, and the Extrajudicial-Killing Claims Therefore Fail as a Matter of Law.** ..... 16
  - **3. Plaintiff Anbees Failed to Demonstrate Standing to Bring This Action on Behalf of the Deceased's Estate.** ..... 18
  - **4. The Complaint Fails to State a Claim for Torture.** ..... 19

**CONCLUSION** ..... 21

**PRELIMINARY STATEMENT**

Defendant Saddam Hifter, by and through undersigned counsel, appears specially and for the limited purpose of moving to dismiss the Second Amended Complaint. He does not submit to the jurisdiction of this Court and does not waive any defense available under Federal Rule of Civil Procedure 12(b) or otherwise. He submits this memorandum after offering, in the interest of judicial economy, to waive service of the Complaint so that this motion could be decided.

The threshold defect is jurisdictional. Plaintiffs invoke Rule 4(k)(2) as the sole basis for personal jurisdiction over Saddam Hifter (Compl. ¶ 17), but they allege no domicile in any United States forum and no conduct by him directed at the United States. The events at issue took place in and around Espiaa, Libya, on September 23-24, 2019. Nothing in the Complaint connects those events to this country. The Court therefore lacks personal jurisdiction, and the Complaint must be dismissed under Rule 12(b)(2).

In the alternative, and only if the Court reaches the merits, the Complaint fails to state a claim under Rule 12(b)(6) for four independent reasons. First, it does not plausibly plead that Saddam Hifter exercised command responsibility over the Wagner Group personnel who allegedly committed the acts at issue; the pleading alleges coordination rather than command, and it affirmatively alleges that Prigozhin commanded Wagner and refused to let his fighters serve under anyone else's command. (Compl. ¶¶ 9, 79.) Separately, the Supreme Court's recent decision in *Cisco Systems, Inc. v. Doe* forecloses the Complaint's conspiracy and aiding-and-abetting theories, because the TVPA does not provide for those causes of action. Second, it fails to allege a "deliberated" killing, because it describes intoxicated men firing haphazardly rather than a considered, purposeful act. (Compl. ¶¶ 62-63.) Third, Plaintiff Anbees has not established his standing to sue on behalf of the Deceased's estates, having neither alleged appointment as

executor nor pleaded any legal basis to proceed as a wrongful-death claimant. Fourth, the alleged conduct does not meet the rigorous definition of "torture" that the TVPA and controlling precedent require.

Respectfully, this is a technical legal motion addressed to whether United States law affords a remedy against this defendant on the facts as pleaded. It is not a comment on the human cost of the events described in the Complaint, and by filing it Defendant does not seek to minimize or discount that cost.

## FACTUAL BACKGROUND

### A. The Proceedings So Far Relating to Defendant Saddam Hifter

Plaintiffs filed this action on July 18, 2023, asserting claims under the Torture Victim Protection Act of 1991 ("TVPA") arising from an incident in Libya on September 23-24, 2019. (ECF No. 1.) Saddam Hifter was not named as a defendant until the Second Amended Complaint, filed nearly two years later on April 29, 2025. (ECF No. 12 (the "Complaint").) The Complaint does not allege that Saddam Hifter was personally present at, aware of, or specifically ordered the alleged incident. The Complaint alleges personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2) but alleges no conduct by Saddam Hifter directed at the United States, nor that he is domiciled in the United States. (*Id.* ¶ 17.)

On April 29, 2025, Plaintiffs personally served the Complaint on the wrong person but claimed to have served Defendant Saddam Hifter. On April 13, 2026, Plaintiffs moved for entry of default against Saddam Hifter. (ECF No. 21.) The next day, counsel for Saddam Hifter made a limited appearance to oppose entry of judgment on the grounds that Plaintiffs failed to serve Saddam Hifter. (ECF No. 23.) In reply, Plaintiffs raised a new argument that the Court should authorize Plaintiffs to serve Defendant Saddam Hifter through limited-appearance counsel. (ECF No. 25.) The Court directed Saddam Hifter's counsel to address Plaintiffs' new argument. (Minute

Order, May 8, 2026.) Saddam Hifter opposed the bases of Plaintiffs' argument but nonetheless offered to voluntarily waive service of the Complaint in the interest of judicial economy for the purpose of filing this motion to dismiss, which, for the reasons below, should end the matter. (ECF No. 26.) The Court denied Plaintiffs' motion for entry of judgment and adopted Defendant Hifter's proposed briefing schedule.

**B. The Alleged Incident**

The Complaint seeks $80 million damages for events on September 23-24, 2019, in Espiaa, approximately 30 miles south of Tripoli, Libya, alleged as follows[1]:

On September 23, 2019, Plaintiff Mohammed Abuojaylah Ali Anbees ("Anbees") and his family (including father Abuojaylah Ali Mohammed Anbees, brother Mohanad Abuojaylah Ali Anbees, brother-in-law Hamza Amar Jumma Barbash (together, the "Deceased"), and brother Husam (not a party to this suit)) were at their house in Espiaa after fighting had broken out around Tripoli. (Compl. ¶ 53.)

During a lull in hostilities at around 14:30, Anbees drove over back roads and fields toward his farm a few miles away to retrieve a television remote. After approximately 800 meters, he encountered armed uniformed soldiers in the road. They signaled at him. Assuming they were Libyan soldiers instructing him to turn around, Anbees did so, driving back toward his home. The soldiers fired their weapons into the air. (*Id.* ¶¶ 53-54.)

Anbees returned to the house in Espiaa. Approximately 30 minutes later, three to six men armed with AK-47's entered through the unlocked front door. Anbees assumed they were

---

[1] On a motion to dismiss, the Court must "assume 'all the allegations in the complaint are true (even if doubtful in fact)'" and "must give the plaintiff' the benefit of all reasonable inferences derived from the facts alleged.'" *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 17 (D.C. Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) and *Stewart v. Nat'l Educ. Ass'n*, 471 F3d 169, 173 (D.C. Cir. 2006)).

Russian, Wagner Group mercenaries because they had blue eyes, handled their weapons professionally, came in a unique vehicle, and Wagner Group had a "widespread presence" in the area at that time. (*Id.* ¶ 55.)

The presumed Wagner Group soldiers aimed rifles at the Anbees family members and took their cellphones. The soldiers escorted them to a Nissan pickup truck with three more soldiers and ordered Anbees and the others onto the truck bed. Then they blindfolded their prisoners and drove for approximately 20 minutes. (*Id.* ¶¶ 55-56.)

When they stopped the vehicle and removed Plaintiffs' blindfolds, Anbees saw that they were at a residential home in Qasr bin Ghashir, between Espiaa and Tripoli. At the time, this village was believed to be a Wagner Group military base. There, Anbees saw "about 35 Russian men, presumably all Wagner soldiers" who were inside sleeping and drinking alcohol. Anbees and the others asked their captors in Arabic why they were being detained, but the soldiers did not answer. (*Id.* ¶ 57.)

The soldiers then took Plaintiffs to a different Nissan with heavily tinted windows, and they drove away. They passed through roadblocks—then controlled by forces associated with the LNA and Khalifa Hifter—by honking their horns. Once they arrived at a juice factory, the soldiers bound Anbees and family "before wrapping a plastic bag around each man's face." They were forced into the back of a refrigerated box truck and driven for four to five hours. Periodically the truck stopped and the soldiers "pour[ed] water on Plaintiff Anbees and his family members." (*Id.* ¶¶ 58-59.)

At around 21:00, the soldiers removed Plaintiffs from the truck. A soldier escorted Anbees to use the toilet. While walking he put a pistol to Anbees' head "and asked in broken English if Plaintiff Anbees was Muslim and a member of ISIS." Approximately two hours later,

the soldiers transported Plaintiffs in the truck back to the residential home in Qasr bin Ghashir. They put Plaintiffs in a room in the house with Russian men inside, ordered them to sleep, and stood guard outside. (*Id.* ¶¶ 60-61.)

The next morning, on September 24, soldiers blindfolded Plaintiffs and took them to an area near Anbees' home. The soldiers dragged them out of the vehicle, one by one. They ordered them to kneel on the ground. What happened next is alleged as follows:

> Anbees heard the clicking sound of someone loading a gun and trying to pull the trigger and the Wagner soldier putting Plaintiff Anbees on his knees dropped his hands off Plaintiff Anbees and ran away, pulling the trigger on his weapon as well. Two Wagner soldiers began firing their AK-47 rifles in rapid succession at Plaintiff Anbees and his family. Plaintiff Anbees believed that the soldiers were intoxicated because the shots, while aimed at the kneeling men, were being fired haphazardly.

Anbees fell over immediately pretending to be dead until he heard the Wagner soldiers drive away. Anbees' father, brother and brother-in-law did not survive. (*Id.* ¶¶ 62-63.)

The Complaint does not allege that the alleged incident in any way targeted or involved the United States.

**C. The Allegations Against Defendants Prigozhin and Khalifa Hifter**

In a section entitled "Yevgeny Prigozhin's Command Responsibility," the Complaint alleges that Prigozhin commanded the Wagner Group from 2014 through 2023. (Compl. at ¶¶ 78-80.) It alleges that Prigozhin "gave orders to the soldiers as the chief of Wagner while operating under the authority of Defendant Khalifa Hifter and the LNA," and that he was "commanding the actions of Wagner at the direction of Defendant Khalifa Hifter." (*Id.* at ¶ 81.) But "Prigozhin refused to let his fighters serve under someone else's command." (*Id.* at ¶ 79.)

As to Khalifa Hifter, the Complaint alleges in a section entitled "Khalifa Hifter's Command Responsibility" that he is the "unequivocal leader of the LNA," has "not identified anyone to be his successor," "gives all executive orders to the military," "has a duty under both domestic law

and international law to ensure the protection of civilians, to prevent the LNA from violating international law, and to ensure all persons under his command are trained in, comply with, and punished, when necessary, under the laws of warfare," and refused to take steps to punish personnel under his command for committing abuses, like the incident involving the Plaintiffs, which they allege was part of a pattern of human rights violations against the civilian population that he intentionally directed. (Compl. ¶¶ 71-77.) Through a six-month contract between Khalifa Hifter and Wagner Group, arranged with Prigozhin, the Complaint alleges that Khalifa Hifter hired Prigozhin's Wagner "to serve as the decisive defense force of the LNA." (Compl. ¶¶ 84-86.)

**D. The Allegations Against Defendant Saddam Hifter**

The Complaint does not allege facts that Saddam Hifter[2] was personally aware of, present at, or otherwise ordered the alleged incident. Nor does it contain a section, as it does for Khalifa Hifter and Prigozhin, setting out any command responsibility. Plaintiffs allege that Saddam rose to prominence within the LNA through a combination of familial influence, rapid military appointments, and his involvement in key strategic military operations. (Compl. ¶ 3.) According to the Complaint, Saddam aided Khalifa in an operation to overthrow the GNA. (*Id.*) Generally, Plaintiffs allege that Saddam and the other defendants coordinated the use of Wagner forces commanded by Prigozhin to execute Khalifa's plan to take control of Libya. (*Id.* at ¶ 9.) They allege that Saddam, as a senior commander within the LNA and in close operational proximity to Khalifa, supervised and orchestrated substantial elements of the 2019 military campaign to seize control of Tripoli. (*Id* at ¶ 46.) Saddam's command role allegedly was central to the planning, coordination, and execution of operations against the GNA and civilian infrastructure. (*Id.*)

[2] Although Plaintiffs allege that Saddam Hifter is a dual citizen of Libya and the United States (*Id.* ¶ 14) he is *not* a U.S. citizen.

Because Khalifa allegedly hired Prigozhin to provide the support of Wagner in the LNA offensive on Tripoli, the Complaint asserts that Prigozhin therefore was operating Wagner under Khalifa and Saddam's authority. (*Id.* at ¶ 87.)

## ARGUMENT

### A. This Court Lacks Personal Jurisdiction Over Defendant Saddam Hifter Because He Is Not Domiciled in Any United States Forum and the Complaint Alleges No Conduct Directed at the United States

Plaintiffs assert personal jurisdiction over Saddam Hifter solely under Rule 4(k)(2) of the Federal Rules of Civil Procedure. (Compl. ¶ 17.) Even if Plaintiffs' allegation that Saddam Hifter is a dual citizen of Libya and the United States were accurate (it is not), that allegation does not supply jurisdiction. (Compl. ¶¶ 3, 14 (*but see supra*, n.2).) Saddam Hifter is not domiciled in the District of Columbia or in any other United States forum, and the Complaint alleges no act by him directed at the United States in connection with the events of September 23-24, 2019, in Espiaa, Libya. (Compl. ¶ 17.) On that record, the Court cannot exercise personal jurisdiction over him consistent with the Due Process Clause of the Fifth Amendment.

The Supreme Court recently has addressed the governing constitutional standard for personal jurisdiction. In *Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025), the Supreme Court declined to import the Fourteenth Amendment's minimum contacts standard into the Fifth Amendment, holding instead that the Fifth Amendment permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority. *Fuld* arose, however, from a specific congressional enactment, the Promoting Security and Justice for Victims of Terrorism Act, which expressly deemed the defendants to have consented to personal jurisdiction based on defined categories of United States-related conduct.[3] The TVPA contains no

---

[3] Specifically, the statute applied in *Fuld* targeted predicate conduct with a close connection to the United States. It established a U.S.-based forum solely for American victims (606 U.S. at 24), and

comparable provision. It creates a cause of action; it says nothing about personal jurisdiction and deems no defendant to have consented to suit. Jurisdiction here rests entirely on Rule 4(k)(2), the court-promulgated rule that incorporates no substantive federal policy or congressional interest in subjecting defendants to federal jurisdiction. The foreign-policy judgment to which *Fuld* deferred is simply absent. The Supreme Court did not delineate the outer bounds of federal jurisdictional power in *Fuld*, but it also did not purport to supplant the Fourteenth Amendment's analogous due process test in cases arising outside such a statute.[4]

The D.C. Circuit's most recent treatment of the question within the past two weeks construes *Fuld* narrowly, implying it does not change the jurisdictional test previously applied by the D.C. Circuit in TVPA cases. In *Gligorov v. Nation of Brunei*, __ 4th __, No. 24-7150, 2026 WL 2276372 (D.C. Cir. Aug. 7, 2026), the court affirmed the dismissal of claims for lack of personal jurisdiction in a civil RICO case where, as here, jurisdiction had been asserted under Rule

it only applied to two identified foreign entities, both of which had 'meaningful contacts, ties [and] relations' with the United States." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) (internal quotation omitted)). Unlike the TVPA, the statute in *Fuld* did "not put respondents at broad risk of being hauled into U.S. courts for myriad civil liability actions. Rather, the statute applies only to . . . a narrow category of claims that provide civil remedies only for Americans injured by acts of international terrorism." *Id.* at 20.

[4] The statute in *Fuld* contained an express jurisdictional trigger, deeming defendants to have consented to personal jurisdiction upon defined United States-related conduct. The TVPA contains no comparable provision; it creates a cause of action, says nothing about personal jurisdiction, and deems no defendant to have consented to suit. Accordingly, *Fuld* has not changed or otherwise disturbed the jurisdictional analysis applicable to the TVPA. 606 U.S. at 11 ("Any difference between the Fifth and Fourteenth Amendments is therefore implicated in only a subset of federal cases, such as those in which personal jurisdiction is—as in the PSJVTA—'authorized by a federal statute.'" (quoting Fed. R. Civ. P. 4(k)(1)(C).) *See Gligorov v. Nation of Brunei*, __ 4th __, No. 24-7150, 2026 WL 2276372, at * 8 (D.C. Cir. Aug. 7, 2026) ("we recently cautioned that '[a]ny seemingly broad statements in [*Fuld*] must be read as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering.'" (quoting *Akhmetshin v. Browder*, 181 F.4th 1307, 1312 (D.C. Cir. 2026), internal quotation omitted)).

4(k)(2).[5] Because the parties there agreed on the applicable framework, the court assumed without deciding that a reasonableness test governs; it did not hold that reasonableness is the controlling test.[6] The court nonetheless drew a distinction that bears directly on *Fuld*'s potential impact on this case and all TVPA cases. Unlike the statute at issue in *Fuld*, Rule 4(k)(2) is a court-promulgated rule, and as such it "does not communicate any substantive federal policy or congressional interest in subjecting defendants to federal jurisdiction." *Id.* at * 8. As such, it concluded that where jurisdiction "flows, if at all, from a court-made rule rather than a statute, [a] case is an odd fit for the Supreme Court's analysis in *Fuld*." *Id.* Whatever flexibility *Fuld* affords where Congress has spoken does not attach to a procedural rule that expresses no congressional jurisdictional judgment. Accordingly, pre-*Fuld* case law on Rule 4(k)(2) personal jurisdiction under the TVPA remains good law.

Binding pre-*Fuld* D.C. Circuit precedent forecloses jurisdiction under the TVPA premised on conduct abroad that was not directed at this country. In *Lewis v. Mutond*, 62 F.4th 587 (D.C. Cir. 2023), the court affirmed dismissal of a TVPA action for lack of personal jurisdiction, holding that the torture of an American abroad, unless directed at the United States, does not support jurisdiction. *Lewis* rested in part on the understanding that the Fifth and Fourteenth Amendment inquiries are analogous. However, after *Fuld*, which did not establish a new test outside of a specific statute conferring personal jurisdiction, and in light of the D.C. Circuit's narrow

[5] *Fuld* was decided after oral argument in *Gligorov*, and so the D.C. Circuit first ordered supplemental briefing and re-argument on the appropriate test for personal jurisdiction under the Fifth Amendment. 2026 WL 2276372, at *4.

[6] It found the district court lacked jurisdiction because plaintiff "failed to adequately allege a concrete interest in litigating this case in the United States," and "has not identified any meaningful interest that the United States has in resolving this dispute," which was between completely non-U.S. parties with no meaningful connections to the United States related to the alleged dispute. 2026 WL 2276372, at *5.

interpretation of *Fuld*'s holding in *Gligorov*, we submit that the personal jurisdiction test remains unaltered as applied to the TVPA in this Circuit, and the Fifth Amendment test is in all respects materially identical to the "minimum contacts" test applied under the Fourteenth Amendment.

A court in this District thoughtfully applied these principles to a materially identical claim, just before *Fuld*. In *Peters v. Estate of Qadhafi*, No. 21-0516 (CKK), 2025 WL 833206 (D.D.C. Mar. 17, 2025), the plaintiffs brought TVPA claims arising from torture in Libya and invoked Rule 4(k)(2). The court denied their motion for default and dismissed for lack of personal jurisdiction, holding that the plaintiffs' status as citizens and residents of the United States did not, without more, give the court personal jurisdiction over their suit. *Id.* at * 6. Plaintiffs failed to allege facts "that support[ed] a plausible inference that the defendants purposefully targeted the United States." *Id.* at * 9.

Similarly, the Fourth Circuit recently rejected a plaintiff's personal jurisdiction arguments in another TVPA action against Saddam Hifter's co-defendant, Khalifa Hifter. *See Al-Suyid v. Hifter*, 139 F.4th 368 (4th Cir. 2025). There, the plaintiffs argued that the District of Virginia had specific personal jurisdiction over Khalifa Hifter because he (1) allegedly owned property in Virginia; (2) hired legal counsel in Virginia; and (3) agreed to a joint discovery plan in the litigation. Even under these facts, the Court of Appeals found this insufficient for specific personal jurisdiction because "none of the contacts with Virginia that the plaintiffs identified in their opening brief have the necessary connection to [Khalifa] Hifter's alleged unlawful conduct in Libya." *Id.* at 377. The Complaint in this case alleges *no* conduct targeting the United States or the District of Columbia, less than the Fourth Circuit Court of Appeals found insufficient in *Al-Suyid*.[7]

[7] Though the plaintiffs in *Al-Suyid*, forfeited any 4(k)(2) argument, and the Court applied a 4(k)(1) general personal jurisdiction analysis, it went on to find that plaintiffs also failed to plead specific personal jurisdiction

Even were Plaintiffs to contend this Court should apply some broader Fifth Amendment due process standard than applied in pre-*Fuld* TVPA jurisprudence, no constitutionally appropriate standard would permit jurisdiction to be exercised over Defendant Saddam Hifter here, where the Complaint alleges that he has no United States contact and fails to allege any United States-directed conduct *at all*. Because the Complaint pleads no domicile in any United States forum and no conduct by Saddam Hifter directed at the United States, the exercise of personal jurisdiction over him would be unreasonable and inconsistent with the Fifth Amendment. The Complaint should be dismissed as against him under Rule 12(b)(2). The arguments that follow are presented solely in the alternative.

**B. Even If the Court Had Personal Jurisdiction Over Defendant Saddam Hifter, It Must Dismiss the Complaint Under Rule 12(b)(6) Because It Fails to State a Claim**

When deciding a motion to dismiss a cause of action for failure to state a claim under Rule 12(b)(6), the court must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor" and determine whether it states a claim to relief that is "plausible on its face." *Benneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015). A claim is plausible when it contains factual allegations that, if proved, would "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Plaintiffs assert claims here under the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, § 2(a), 106 Stat. 73, 73 (Mar. 12, 1992), codified as a note to Title 28, United States Code, Section 1350. The TVPA authorizes "a federal statutory cause of action on behalf of victims or their representatives for acts of torture or extrajudicial killings." *Fisher v. Great Socialist People's Libyan Arab Jamahiriya*, 541 F.Supp.2d 46, 54 (D.D.C. 2008). "Section 2(a)(1) creates a cause of action for individuals who themselves are subjected to torture," and "Section

2(a)(2) creates a cause of action for the legal representatives of individuals who have been subjected to an extrajudicial killing, or for any person who may be the claimant in a wrongful death action on behalf of a victim of an extrajudicial killing." *Al-Suyid v. Hifter*, 20 civ. 170, 2026 WL 963356 (E.D. Va. May 13, 2026). Plaintiff Anbees claims damages under Section 2(a)(1) for torture on his own behalf and claims damages under Section 2(a)(2) as "Personal Representative of the Estates" of the Deceased for torture and extrajudicial killing.

For the reasons below, the Complaint against Saddam Hifter fails under the TVPA because (1) it fails to state a claim against Saddam Hifter under command responsibility; (2) it fails to allege a "deliberated" killing; (3) Anbees fails to establish standing to sue on behalf of the Deceased's estates; and (4) it fails to state a claim for "torture," and the TVPA does not provide a torture cause of action for the estates of deceased individuals.

**1. The Complaint Fails to Plead That Saddam Hifter Had Effective Control Over the Alleged Perpetrators, and the Command-Responsibility Claim Therefore Fails.**

To state a claim under the doctrine of command responsibility, a plaintiff must allege: (1) a superior-subordinate relationship between the defendant and the perpetrator of the crime; (2) that the commander knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit the acts at issue; and (3) that the commander failed to prevent the crimes or failed to punish the subordinates afterward. *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1288 (11th Cir. 2002); *see also Cisco Systems, Inc. v. Doe*, 609 U.S. ___, 146 S.Ct. 1882, 1907 (2026) (Sotomayor, J., *dissenting* (quoting *Chavez v. Carranza*, 559 F.3d 486, 499 (6th Cir. 2009))). The first element is a threshold requirement, and it is demanding. The superior-subordinate relationship requires "effective control," meaning "a material ability to prevent or punish criminal conduct, however that control is exercised." *Id.* at 1290. "[A] showing of the defendant's actual ability to control the guilty troops is required as part

of the plaintiff's burden under the superior-subordinate prong of command responsibility." *Id.* at 1291. The Complaint does not make that showing as to Saddam Hifter.

What the Complaint pleads is coordination, not command. It alleges that Khalifa Hifter, Saddam Hifter, and Yevgeny Prigozhin "coordinated the use of Wagner mercenary forces commanded by Yevgeny Prigozhin to execute Defendant Khalifa Hifter's plan to take control of Libya." (Compl. ¶ 9.) That is a description of a lateral relationship among three actors, and it identifies someone else, Prigozhin, as the person who commanded the forces. Coordinating with the party who controls the perpetrators is not the same as controlling them.

The Complaint goes further and affirmatively negates Saddam Hifter's effective control. It alleges that Prigozhin "had been the commander of Wagner since its inception until his death," and that Prigozhin "refused to let his fighters serve under someone else's command." (Compl. ¶ 79.) Plaintiffs are bound by their own pleading. If Prigozhin refused to permit Wagner fighters to serve under anyone else's command, then Saddam Hifter lacked the material ability to prevent or punish their conduct, which is precisely what *Ford* requires. The Complaint also confirms the alleged command asymmetry in its drafting structure: it contains dedicated sections setting out the command responsibility of Khalifa Hifter and of Yevgeny Prigozhin, and no comparable section for Saddam Hifter. (Compl. ¶¶ 71-81.) Headings are not dispositive, but the absence of any pleaded command relationship is.

Courts have rejected command-responsibility claims resting on precisely this sort of lateral or facilitative relationship. In *Reynolds v. Higginbottom*, No. 19-cv-5613, 2022 WL 864537 (N.D. Ill. Mar. 23, 2022), the court dismissed a TVPA command-responsibility claim where the complaint alleged that the civilian defendant paid someone to arrest and torture him, but did not allege that he had a superior-subordinate relationship with, or controlled, the security forces that

carried it out. Nor did plaintiff allege that the defendant ordered anyone to torture him, though defendant "may have had influence" over the political leader. As the court explained, the doctrine requires a superior-subordinate relationship, and "[b]ankrolling conduct isn't the same thing as ordering conduct." *Id.* at * 13. Coordination, like financing, lacks the material ability to control, prevent, or punish the perpetrators' conduct.

Nor may Plaintiffs bridge the gap through Prigozhin. Even on Plaintiffs' own theory, any authority Saddam Hifter held over Wagner operatives ran through Prigozhin, who commanded them. *See Doe v. Drummond Co.*, 782 F.3d 576, 610 n.47 (11th Cir. 2015) (observing, in a footnote cautioning about the doctrine's limits, that "if the secondary liability of the superior must rest on another secondary liability theory, the application of the doctrine may be too attenuated or the act too remote to support liability"). A district court applied that reasoning to dismiss command-responsibility claims where the defendants' alleged control over the perpetrators ran only through intermediaries, holding that the plaintiffs had not alleged that the defendants "had any direct control over any AUC members who might have killed Plaintiffs' decedents as required by the command responsibility doctrine," and that the theory was "simply too attenuated to support liability." *Penaloza v. Drummond Co.*, 384 F. Supp. 3d 1328, 1345 (N.D. Ala. 2019). The same defect appears here.

The Complaint's remaining allegations against Saddam Hifter are conclusory labels that do not supply the missing element. Plaintiffs allege that he "supervised and orchestrated substantial elements of the 2019 military campaign to seize control of Tripoli" and that his command role "was central to the planning, coordination, and execution" of LNA operations. (Compl. ¶ 46.) They allege that Prigozhin "was therefore operating Wagner under the authority of Defendant Khalifa Hifter, Defendant Saddam Hifter and the LNA." (Compl. ¶ 87.) And they allege that he "was

appointed as one of the commanders of the LNA's military offensive on Libya's capital, Tripoli." (Compl. ¶ 103.) None of these allegations states that Saddam Hifter had the ability to prevent or punish the specific men who allegedly detained and shot Plaintiff Anbees and his family. Paragraph 87 asserts a legal conclusion about whose "authority" Wagner operated under, and that conclusion is contradicted by the same pleading's allegation that Prigozhin would not permit his fighters to serve under another's command. (Compl. ¶ 79.) Allegations of seniority within the LNA and participation in the Tripoli campaign describe rank and involvement, not effective control over Wagner personnel.

Such conclusory assertions are insufficient. Allegations that high officials "exercised command responsibility over, conspired with, ratified, and/or aided or abetted subordinates" are, without adequate factual support of more specific acts by those defendants, "bare assertions" that are "not entitled to be assumed true." *Mamani*, 654 F.3d at 1153-55. The court cautioned that the statute does not embrace strict liability akin to respondeat superior for national leaders at the top of a long chain of command. *Id.* at 1154. Plaintiffs ask the Court to do exactly that here.

A further and independent defect compounds Plaintiffs' command-responsibility claim: the Complaint does not plausibly identify the perpetrators. Plaintiff Anbees "concluded that the armed men were mercenaries from Wagner" because "the men had blue eyes, were handling their weapons like professionals, drove a unique model of vehicle, and because there was a widespread presence of the Wagner in the area at that time." (Compl. ¶ 55.) He later "saw about 35 Russian men, presumably all Wagner soldiers." (Compl. ¶ 57.) Eye color, apparent proficiency with weapons, a vehicle model, and the general presence of a group in a region are inferences, not facts establishing affiliation. If the affiliation of the direct perpetrators is an assumption, so too is the

superior-subordinate relationship. For these reasons, the Complaint fails to state a claim for command responsibility as to Defendant Saddam Hifter and should be dismissed.

Plaintiffs also sue Saddam Hifter under theories of conspiracy and aiding and abetting theory. (Compl. at ¶ 107.) However, after Plaintiffs' filed the Complaint, the U.S. Supreme Court found that the TVPA provides no cause of action for aiding and abetting. *Cisco Systems, Inc.*, 146 S.Ct. at 1886. Post-*Cisco Systems, Inc.*, there is also no viable cause of action for conspiracy to violate the TVPA, because the statute is equally silent on conspiracy as it is on aiding and abetting. The Complaint includes conclusory allegations that the defendants "conspired," but does not plead any agreement to commit the alleged September 2019 act, nor any overt acts by the defendants in furtherance of those acts. Thus, even if conspiracy were viable under the TVPA, the Complaint fails to state such a cause of action.

**2. The Complaint Fails to Allege a "Deliberated" Killing, and the Extrajudicial-Killing Claims Therefore Fail as a Matter of Law.**

The TVPA does not reach every killing. It reaches a "deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court." Deliberation is an element, and Plaintiffs must plead it. The D.C. Circuit has identified the components of the statutory definition as "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court," and has explained that a killing is "deliberated" where it involves "substantial preparation, meticulous timing, and coordination." *Owens v. Republic of Sudan*, 864 F.3d 751, 770 (D.C. Cir. 2017) (citing *Mamani v. Berzain*, 654 F.3d 1148, 1155 (11th Cir. 2011) (defining "deliberated" under the TVPA as "being undertaken with studied consideration and purpose")), *vacated and remanded on other grounds by Opati v. Republic of Sudan*, 590 U.S. 418 (2020). Courts in this District apply the same understanding, describing a deliberated killing as one "arrived at or determined upon as a result of careful thought and weighing

of considerations for and against the proposed course of action." *Colvin v. Syrian Arab Republic*, 363 F. Supp.3d 141, 158 (D.D.C. 2019) (quoting *Flanagan v. Islamic Republic of Iran*, 190 F. Supp.3d 138, 163 (D.D.C. 2016)).

Measured against that standard, the Complaint pleads itself out of the element. Plaintiffs do not allege a planned or ordered execution. They allege the opposite. According to the Complaint, "Plaintiff Anbees believed that the soldiers were intoxicated because the shots, while aimed at the kneeling men, were being fired haphazardly." (Compl. ¶ 63.) Plaintiffs further allege that, immediately before the shooting, one soldier dropped his hands off Plaintiff Anbees and ran away while pulling the trigger on his own weapon. (Compl. ¶ 62.) Haphazard fire by intoxicated men, one of whom fled mid-episode, is not substantial preparation, meticulous timing, or coordination. It is not the product of careful thought and the weighing of considerations. Taking these allegations as true, as the Court must, they describe a chaotic and unplanned discharge of weapons rather than a deliberated killing.

The Eleventh Circuit's analysis in *Mamani v. Berzain* is directly on point. There, the court held that plaintiffs had alleged no facts showing that the deaths "met the minimal requirement for extrajudicial killing," namely that they were "deliberate" in the sense of being "undertaken with studied consideration and purpose." *Mamani v. Berzain*, 654 F.3d 1148, 1155 (11th Cir. 2011). The court explained that the pleaded deaths "could plausibly have been the result of precipitate shootings during an ongoing civil uprising," and were "compatible with accidental or negligent shooting." *Id.* The alleged shootings here arose in the midst of an ongoing armed conflict around Tripoli (Compl. ¶ 53), and the Complaint's own characterization of intoxication and haphazard fire places them squarely within the category *Mamani* held insufficient.

Defendant acknowledges that the Eleventh Circuit revisited related questions in *Mamani v. Sanchez de Lozada Sanchez Bustamante*, 968 F.3d 1216 (11th Cir. 2020), and that certain language in that decision cuts against a narrow reading of the element. The court there held that an extrajudicial killing "can be deliberate even if the state-actor is not targeting a particular individual," and it quoted the district court's observation in *Owens* that "the statutory definition does not contain a precision-targeting element." *Id.* That authority does not assist Plaintiffs. The same court held that the statute "requires, at a minimum, that there be a considered, purposeful act that takes another's life," and it distinguished such an act from killings resulting from accidental or negligent behavior. *Id.* The question is therefore not whether the shooters selected particular victims by name. Defendant does not contend that precision targeting is required. The question is whether the Complaint pleads a considered, purposeful act at all. Allegations of intoxication and haphazard fire plead the absence of consideration, not its presence.

This argument addresses the claims asserted under Section 2(a)(2) of the TVPA on behalf of the Estates of the Deceased for extrajudicial killing. It does not, standing alone, dispose of Plaintiff Anbees' individual claim under Section 2(a)(1) for torture, which fails for the separate reasons set forth below. As to the extrajudicial-killing claims, however, the Complaint fails to allege a deliberated killing, as that term is used in the TVPA, and those claims should be dismissed.

**3. Plaintiff Anbees Failed to Demonstrate Standing to Bring This Action on Behalf of the Deceased's Estate.**

Plaintiffs' claim for damages under the TVPA as "personal representative" of the Deceased (Compl. at ¶ 1) fails because Anbees has not demonstrated that he has standing under the TVPA to bring the action on their behalf. Section 2(a)(2) of the TVPA sets out a cause of action in the event of an extrajudicial killing "for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death." The Complaint asserts neither that

Anbees is the Deceased's estates' legal representative, nor that he could proceed as a claimant in a wrongful death action.

First, as the term "legal representative" is used in the TVPA, its "legislative history makes clear that [it] is limited to the 'executor or executrix of the decedent's estate.'" *Al-Suyid v. Khalifa Hifter*, No. 20-cv-170, 2026 WL 950623, *2 (E.D. Va. Jan. 8, 2026) (quoting *Kuiper v. Reyes Mena*, 2025 WL 2626111, at *15 (E.D. Va. Sept. 10, 2025), quoting, in turn, S. Rep. No. 102-249, at 7). Just as in *Al-Suyid* and *Kuiper*, the Complaint here does not contain any allegations that Anbees is the executor of the Deceased's estates, and therefore he has no standing to bring this action under the TVPA.

Second, the Complaint also fails to allege that Anbees is a proper wrongful death claimant under D.C. law. Section 16-2702 of the D.C. Code provides that a wrongful death suit "shall be brought by and in the name of the personal representative of the deceased person." "The term 'personal representative' as used in this section is limited to officially appointed executors and administrators." *Saunders v. Air Florida, Inc.*, 558 F. Supp. 1233, 1235 (D.D.C. 1983) (denying surviving parents' claim where widow had been duly appointed personal representative, citing *Strother v. District of Columbia*, 372 A.2d 1291, 1296 n.7 (D.C. 1977)). Thus, even under wrongful-death-claim standing, Plaintiffs run into the same barrier—the Complaint fails to plead that Anbees is an officially appointed executor of the Deceased's estates.

Lastly, the plain statutory text of TVPA Section 2(a) allows recovery for the estate of a deceased person for damages for that person's killing, but not separate damages for torture. Thus, to the extent Anbees' claim as personal representative of the Deceased here is premised on damages for torture, it is not cognizable under the TVPA, even if Anbees had standing.

#### 4. The Complaint Fails to State a Claim for Torture.

The foundational case exploring the history and meaning of the term "torture" as defined in the TVPA is *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002) (applying the TVPA's "torture" definition to the Federal Sovereign Immunities Act). "Only acts of a certain gravity shall be considered torture." *Id.* at 92 (quotation omitted). "The term 'torture,' in the United States and international usage, is usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain." *Id.* at 92-93 (quoting S. Exec. Rep. No. 101-30, at 14 (1990)). "The critical issue is the degree of pain and suffering that the alleged torture intended to, and actually did, inflict upon the victim. The more intense, lasting, or heinous the agony, the more likely it is to be torture." *Id.* at 93. "This understanding thus makes clear that torture does not automatically result whenever individuals in official custody are subjected even to direct physical assault." *Id.* "[T]orture requires acts both intentional and malicious." *Id.*; *accord id.* ("[T]orture can occur under the FSIA only when the production of pain is purposive, and not merely haphazard."). "The severity requirement is crucial to ensuring that the conduct proscribed by . . . the TVPA is sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes." *Id.* at 92.

Under these exacting standards, the Complaint fails to state a claim for torture under the TVPA. The alleged events, while horrific, are not "extreme, deliberate and unusually cruel practices." The incident lasted only two days. *See Al-Suyid v. Khalifa Hifter*, No. 20-cv-170, 2026 WL 963356, at *5 (E.D. Va. Apr. 9, 2026) (no "torture" where plaintiff was held captive for 23 to 25 days). There is no alleged "intense, lasting or heinous" agony. Plaintiffs were captured, restrained, transported, covered with water in a way they do not allege caused them suffering, and

eventually shot at in a haphazard manner by intoxicated gunmen. "'Although these acts certainly reflect a bent toward cruelty on the part of their perpetrators, they are not in themselves so unusually cruel or sufficiently extreme and outrageous as to constitute torture.'" *Id.* (quoting *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003)). Accordingly, even accepting the allegations of the Complaint as true, it fails to allege "torture" to the extent necessary to state a claim under the TVPA.

## CONCLUSION

For the foregoing reasons, Defendant Saddam Hifter respectfully requests that the Court (1) dismiss the Second Amended Complaint as against him under Rule 12(b)(2) for lack of personal jurisdiction, such dismissal being without prejudice, *see al-Suyid v. Hifter*, 139 F.4th 368 (4th Cir. 2025); (2) in the alternative, dismiss the Second Amended Complaint with prejudice as against him under Rule 12(b)(6) for failure to state a claim upon which relief can be granted; and (3) grant such other and further relief as the Court deems just and proper.

Dated: Washington, D.C.
August 17, 2026

Respectfully submitted,

Timothy Parlatore
Parlatore Law Group, LLP
260 Madison Ave., 17th Floor
New York, New York 10016
timothy.parlatore@parlatorelawgroup.com

Jason A. Masimore *(Pro Hac Vice to be filed)*
Brodbecks Law, PLLC
305 Broadway, 7th Floor
New York, New York 10007
jason.masimore@brodbeckslaw.com

*Counsel for Defendant Saddam Hifter*